UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------x
FRANK LoCASCIO,

                Petitioner,

                MEMORANDUM AND ORDER

  -against-                          00 CV 6015 (ILG)

UNITED STATES OF AMERICA,

                Respondent.
------------------------------------------------x
GLASSER, United States District Judge:

      A complete procedural history of this case can be found in 372 F. Supp.2d 304, 307 n.2 (E.D.N.Y. 2005), familiarity with which is assumed. Briefly, however, this decision is yet another arising from a motion pursuant to 28 U.S.C. § 2255 in which LoCascio claims he was ineffectively assisted by his counsel, Anthony Cardinale, who, he alleges, labored under a conflict of interest. That claim is bottomed upon Cardinale's revelation 8 years after LoCascio's conviction and after John Gotti died that Gotti threatened to kill him if, in representing LoCascio during their joint trial, he individualized LoCascio's interest at Gotti's expense. In a Memorandum and Order reported in 267 F. Supp.2d 306 (E.D.N.Y. 2003), his motion was denied. The Court of Appeals remanded the case for an evidentiary hearing to determine whether Gotti threatened Cardinale as claimed. <u>See</u> 395 F.3d 51 (2d Cir. 2005). The Court prescribed the framework within which that hearing was to be held and what findings must be made as follows:

> To show that such a conflict adversely affected his counsel's performance, LoCascio must establish an 'actual lapse in representation' that resulted from the conflict . . . . This is a two-part showing. <u>First, LoCascio must demonstrate the existence of some 'plausible alternative strategy not taken up by counsel'</u> . . . . <u>Second, LoCascio must show 'causation'</u>---

> i.e., that the alternative defense was 'inherently in conflict with or not undertaken emphasized the attorney's other loyalty or interests'. . . . In other words, he must show that 'trial counsel chose not to undertake [the alternative strategy] because of his conflict.' (citation omitted and emphasis added).

395 F.3d 56-57.

The evidentiary hearing, wrote the Court, "needs to be held as to the existence of both the alleged conflict created by the death threat and any resultant lapse in representation reflected by the alleged change in Cardinale's conduct of LoCascio's defense." 395 F.3d at 57. And, added the Court:

> If the death threat and orders to Cardinale are credibly established, therefore, the hearing must also address whether the threat altered Cardinale's conduct of the trial. A defendant of course is free to pursue a joint defense strategy with a co-defendant, and such a strategy does not create a conflict of interest . . . . If, independent of the threats, Cardinale's representation followed LoCascio's and Gotti's defense strategy and any failure to individuate LoCascio was the result of that strategy, the threats cannot be said to have caused Cardinale to forgo the alternative defense of separating LoCascio from Gotti at trial. (Internal citations omitted.)

395 F.3d at 58.

It is LoCascio's claim that the record justifies the inference that Cardinale was threatened on March 11, 1992, the first day on which Cardinale cross-examined Gravano and on which his representation was unexceptional, but that a reading of the record beginning on March 12th will support his claim that his defense was sacrificed in the interest of Gotti.

A hearing was accordingly held on September 15, 2005, at which Cardinale was

the only witness.

## Discussion

I begin by emphasizing the first showing the Court of Appeals decided that LoCascio must make, namely, that there existed some "plausible alternative defense strategy not taken up by counsel." One can read the entire transcript of the proceeding at which, as indicated, Cardinale was the only witness, and will not find the slightest suggestion as to what plausible alternative defense strategy he could have pursued but didn't. The closest approximation to an attempt to meet that first requirement were the following questions and answers on his direct examination:

> Q. And I want to ask you now, if I may, just focus your attention on the DiBono, D-i-B-o-n-o, the Dibono murder. Was that one of the charges in the indictment against Mr. LoCascio?
>
> A. It was.
>
> Q. And, also, against Mr. Gotti?
>
> A. Yes.
>
> Q. And did this threat come before you cross-examined him on that subject?
>
> A. I believe so. I would have to go back and look. I believe that we had not gotten into the DiBono aspects with any detail.
>
> Q. As a result –
>
> A. I'm not sure again.
>
> Q. If I may ask you this: As a result of the threat you referred to, did you change your course of cross-examination as far as Mr. DiBono was

concerned?

A. In one respect, yes.

Q. Would you tell us what that is?

A. Well, I did not ask certain questions that I would have. Specifically whether or not – in cross-examining Gravano, whether Gravano would agree that he had never had any conversations whatsoever with Frank LoCascio about DiBono and the murder of DiBono, whether or not he – whether it was true that he had never heard Frank LoCascio either before or after the murder of DiBono discuss that event and that he had no personal knowledge of Frank LoCascio's participation in any activities related to a murder regarding Mr. DiBono.

Q. So, if I understand, but for the threat you would have asked those questions, but because of the threat you did not?

A. It is a difficult – it is a difficult situation to say yes or no about that. Those were questions that I had in mind to use, I believed to be safe questions and I did not ask them.

Tr. at 9, 10.

The decision not to ask a question, even if that decision was induced by the alleged threat, can hardly be characterized as an alternative defense strategy which might plausibly have been pursued but wasn't. In that regard, after conceding that he didn't know what answers he would have gotten from Gravano to questions he might have asked on cross examination, the following was elicited on cross-examination:

4

Q. The point is simply you didn't know what he was going to say in response to questions on cross-examination, correct?

A. No, but I could anticipate what he would say based on what he said on direct or whatever 3500 materials there were.

Q. Is it fair to say if you had asked him whether or not he ever had conversations with Frank LoCascio regarding the murder of Louie DeBono, he might have said that in fact he did have those conversations?

\* \* \*

A. I believe that based on his direct examination, 3500 materials, that if such evidence existed Mr. Gleeson or one of the other prosecutors would have brought that out and I believed it to be a fair closed-end question. In fact, he had no discussions whatsoever. That was my conclusion, if you will.

Q. It is possible he might have said that he did have conversations?

A. I guess anything is possible. So, to answer your questions, anything is possible, sure.

Q. And he also might have –

A. I didn't think it was probable.

Q. It is also fair to say he might have had some knowledge of Mr. LoCascio's involvement in that; isn't that correct?

A. Again, and I'm not trying to do anything other than answer your question, based again on his direct on that issue and 3500 materials and whatever else we gathered, I believe if he had any information about Frank LoCascio's participation in that event he would have given it on direct and that it was a fair question. Probability was if I asked in a closed-ended way that I would have gotten the answer that I wanted.

Q. But at the same time you accepted there would have been some risk in asking that question; isn't that correct?

5

A. But I believed the risk to be minimal.

The failure to ask one question in which an adverse risk was embedded, albeit a minimal one, can hardly be said to have foregone "a plausible alternative strategy not taken up by counsel."

The foregoing aside, whether Cardinale did or didn't ask Gravano whether he ever had any conversations with LoCascio about DiBono and the murder of DiBono; whether he ever heard LoCascio before or after DiBono's murder discuss that event or whether he (Gravano) had personal knowledge of LoCascio's participation in any activities related to the DiBono murder, Tr. at 10, is to ignore the evidence at the trial and the verdict against LoCascio.

The evidence presented at trial, GX 3041.1A(T), responsive to and informative on this issue was a conversation between John Gotti and LoCascio, captured on tape on December 12, 1989. The relevant portion of which was as follows:

> Gotti: I took Sammy's word. Louie DiBono. And I sat with this guy. I saw the papers and everything. He didn't rob nothin? You know why he's dying? He's gonna die because he refused to come in when I called. He didn't do nothing else wrong.
>
> LoCascio: You have that meeting yet?
>
> Gotti: No. Gonna have it tomorrow.
>
> LoCascio: Because at that meeting, I predict he's gonna bring you fifty.
>
> Gotti: But I wouldn't take nothing.
>
> \* \* \*
>
> LoCascio: He's buying it, he's buying lunch.

In his direct testimony, Agent Schiliro of the FBI, explained that conversation, in essence, as referring to a decision that was already made that: DiBono was going to be killed and no amount of money would change it. Tr. of Gotti Trial at 2673-74.

Cardinale was aware of that conversation as the following colloquy makes plain:

> Q. They presented evidence in which Mr. LoCascio was captured on tape in that apartment discussing Gambino family business with Mr. Gotti; isn't that correct?
>
> A. That was again their argument, the government's argument.
>
> Q. But they presented those tapes?
>
> A. Yes.
>
> Q. It is not disputed?
>
> A. It is a fact.
>
> Q. They also presented tapes for . . . the family business discussed on those tapes included the dispute regarding Louie DiBono; isn't that correct?
>
> A. Again, I'm not going to characterize it as family business. There was a tape in which the . . . part of the conversation dealt with Mr. DiBono, yes.

Tr. at 24.

That Cardinale understood the significance of that conversation is underscored by the following interchange during his cross-examination at this hearing:

> Q. . . . it is true, is it not, that the whole theory of the government's case was that Gotti, LoCascio and Gravano functioned as an administration of an organized crime family, isn't that correct?
>
> A. That was the theory, yes, sir.
>
> Q. They plotted and committed murders together,

7

>correct?
>
>A. Yes, that's their theory.
>
>Q. It was also the government's theory it was Mr. LoCascio's role in that administration that made him guilty of the charges against him?
>
>A. Essentially, yes.

Tr. at 37-38.

And more pointedly, his understanding is reflected in his summation when he said:

>As far as Frank LoCascio is concerned, he happens to be present a couple of times when there's conversations with a good friend. That is about it.

Gotti Tr. at 7557.

Among the arguments raised by LoCascio on appeal from his conviction was that his culpability regarding the DiBono murder was presumed by his "mere presence" and by his "mere exposure" to conversations in which criminal conduct was discussed, to which the Court of Appeals responded in 6 F.3d 924, 943-45, as follows:

>LoCascio was convicted for crimes stemming from his role as "underboss" of the Gambino Crime Family. The government established at trial that LoCascio's function as underboss was to advise Gotti in the formulation for plans for the Gambino Family's criminal activities. His conviction was principally grounded on his presence in the Ravenite Apartment during discussions about the crimes for which he was convicted, even though he did not personally discuss many of the crimes.
>
>\* \* \*
>
>LoCascio, however, was not convicted for his mere presence. There is a distinction between "mere presence" and "presence under a particular set of circumstances" that indicates participation.
>
>\* \* \*

8

> Although LoCascio's mere presence would not be sufficient to sustain his conviction, the government did far more than establish mere presence.

As the foregoing makes evident, whether Cardinale did or did not ask Gravano the questions he hypothesized, LoCascio's conviction would not have been affected at all.

Not only was there a failure to demonstrate the existence of some plausible defense strategy, there isn't a jot or a tittle to demonstrate "causation," i.e., that this chimerical alternate defense conflicted with Cardinale's other loyalty or interest. Tellingly, in response to the question whether he was caused to forego an alternative defense strategy that he believed would have resulted in LoCascio's acquittal, he responded:

> . . . sitting here today and saying I made conscious decisions back in, you know, 1992, during the course of that trial to do things to hurt Frank LoCascio, <u>I can't say that</u>.

Tr. at 48 (emphasis added.)

"A defendant of course is free to pursue a joint defense strategy with a co-defendant and such a strategy does not create a conflict of interest." 395 F.3d at 58, *supra.* That LoCascio and Gotti were pursuing a joint defense strategy was apparent to the Court of Appeals writing in <u>United States v. Gotti</u>, in 166 F.3d 1202, 1998 WL 870230*1 (2d Cir. 1998): "In addition, LoCascio and Gotti conducted a joint defense at trial, and we have no reason to believe that they were not sharing all information relevant to their defense." That strategy was also acknowledged by Cardinale at this hearing, viz:

> "When I got into the case, I believed, and again this is without any conversations with Mr. LoCascio, that it was a joint defense and that that was the way it was going to be presented."

9

Tr. at 20.

> Q. You never discussed with him [co-counsel John Mitchell] pursuing anything other than a joint defense strategy; isn't that correct?
>
> A. That's correct.
>
> Q. That option was never on the table?
>
> A. Never discussed.
>
> Q. Never discussed?
>
> A. Again, I assumed it to be a joint defense.

Tr. at 27.

Cardinale acknowledged the presentation at their trial of tape recorded conversations between Gotti and LoCascio, surveillance photographs and videos showing Gotti and LoCascio together and evidence that Gotti and LoCascio were two of the three members of the Gambino Family administration. Given all that evidence, Cardinale also conceded that as a defense lawyer it would have been difficult to pursue a defense that denied their association. Tr. at 25-26.

### The Summation

LoCascio contends that Cardinale's summation supports his claim of ineffective assistance. That claim is based upon this direct testimony of Cardinale, which is hardly compelling.

> Q. Do you recall giving your summation in the LoCascio, Gotti trial?
>
> A. I do.
>
> Q. And do you recall a recess being called in the midst of your summation?

> A. Yes.
>
> Q. And during that recess did Mr. Gotti speak to you?
>
> A. He did.
>
> Q. And do you remember what he said?
>
> A. What he said in essence was that I had spent enough time dealing with Frank and that it was time for me to start defending him in the final argument.
>
> Q. And did you then go back and as a result of that statement did you devote –
>
> \* \* \*
>
> Q. Did you as a result of that, Mr. Cardinale, devote the balance of your summation to Mr. Gotti?
>
> A. I don't know if I would put it that way, but I certainly added parts of the final argument that dealt with charges regarding Mr. Gotti.

Tr. at 12.

A coldly neutral reading of Cardinale's summation as a whole would readily reveal the poverty of this claim. At the very outset of his summation, the words which fell from Cardinale's lips belie his testimony that following a recess he was told by Gotti that he should start defending him in his final argument. This is what he said, pre-recess:

> I make no apologies for what I am doing. I face this task on behalf of my client and on behalf of John Gotti, the only way I know how. Head-on.

Gotti Tr. at 7539.

A recitation of the countless references to the transcript of his summation would unduly burden this opinion and render baseless the claim that he individuated LoCascio

11

at Gotti's expense. The pre-recess recitation of a few will, perhaps, suffice.

> What is happening with these tapes, with these transcripts, with these witnesses, what is happening throughout, and what colors and shapes this prosecution is this overriding, overpowering desire and effort on Mr. Gleeson's part to get John Gotti at any cost, to do whatever it takes to win.

Gotti Tr. at 7540.

> On the evidence that they have presented against my client and against Mr. Gotti, or the lack of evidence – and I say that directly and point at this man, because if there's anyone who knows the evidence in this case, or as far as Frank LoCascio is concerned, the lack of evidence, it is him, John Gleeson. He knows this case better than anybody, and he knows the lack of evidence against Frank LoCascio.

Gotti Tr. at 7541.

> I am here, and I said, I am proud to be here representing these men, because these, on very specific issues, are as phony and as glorified frame kind of charges as you will ever, ever see.

Gotti Tr. at 7542.

> I told you another thing. I told you when it came to a certain tape, a very serious crime is charged against my client and Mr. Gotti, this Vastola conspiracy, that we would play a tape and we would be the ones yelling "fix," only we'll prove it.

Gotti Tr. at 7546.

> But the one aspect that was left out, was not emphasized, I wish to emphasize now, and that is, you can't find anyone guilty – and I am referring to my client, Frank LoCascio, and it applies to Mr. Gotti as well – you cannot find anyone guilty of a racketeering charge in this case unless the government proves that that person has committed, beyond a reasonable doubt, at least two crimes.

12

Gotti Tr. at 7551-52.

> One thing is also certain, one thing is irrefutable, one thing there can be no dispute on between Mr. Gleeson or the government and myself, and that is, Frank LoCascio and John Gotti committed no crime -

Gotti Tr. at 7556.

> I want to see if by addressing this one count you will get an idea of what has been happening as far as Frank LoCascio is concerned, as far as John Gotti is concerned in the course of this case.

Gotti Tr. at 7559.

> Whatever Gravano, whatever simmering hatred he kept going on with DiBono is another matter, but as far as Mr. Gotti, Mr. LoCascio are concerned, Dibono had no problems by 3/28.

Gotti Tr. at 7571.

See also the Gotti transcripts at pages 7566, 7570, 7574 and 7578, much of which is devoted to the DiBono murder for which both Gotti and LoCascio were charged.

Cardinale's post-recess summation is largely devoted to an attack on Gravano's credibility which Cardinale believed was the key to the government's case, with passing references to the lack of evidence against LoCascio and concluding with:

> But if you'll just live up to the obligations and the sacrifice we've seen you all give us here in this case and if you'll do that if you'll test their case and test it and test it again, Frank LoCascio and John Gotti have nothing to fear because you will have only one verdict, and that will be not guilty.

Gotti Tr. at 7616.

The replication of so many portions of the Gotti transcripts might have been superfluous given this brief excerpt from the hearing of Cardinale's testimony:

> Q. So, it is fair to say, is it not, that throughout your

13

> summation, at numerous points after the alleged threats by Mr. Gotti in the middle of the trial, you focused on what you characterized as a complete lack of evidence against your client; isn't that true?
>
> A.   In the summation?
>
> Q.   Yes.
>
> A.   Yes.
>
> Q.   And that's exactly what any good defense lawyer representing the interests of his client would do; isn't that fair to say?
>
> A.   I guess it is fair to say, yes.

Tr. at 34.

Given the total failure to demonstrate the existence of some plausible alternative defense strategy not taken up by him, and a total failure to demonstrate any lapse in representation of LoCascio, I will forego discussing the credibility of an alleged threat beyond observing the absence of even a shred of evidence that what was allegedly threatened was death.[1]

The extensive resort to the record of this hearing mandated by the Court of

---

[1] Q.  Will you tell us what he said to you and what you said to him?
A.  What he said was that if I ever use a question — if I ever used in a question the words "my client" and excluded him he would take care of me, and I knew what that meant.
  Q. And what did that mean?
  A. I don't know exactly what he had in mind, but I didn't — I took it as a threat.

It is interesting in this regard to note that Cardinale visited Gotti in prison approximately 10 and 15 times between 1992 - 1998, representing him *pro bono* on appeal and on various post-trial motions notwithstanding his alleged threats during the trial. He perceived no conflict in that because the interests of Gotti and LoCascio were inextricably linked. Tr. at 50-51.

14

Appeals and to the relevant portions of their joint trial to demonstrate that the threads of this motion are "as thin as the homeopathic soup that was made by boiling the shadow of a pigeon that had been starved to death" Grosswald v. Schweiker, 653 F.2d 58, 61 (2d Cir. 1981), clouded the fact that the relief sought was predicated upon the alleged ineffective assistance of counsel.

Obedience to the teachings of Strickland v. Washington, 466 U.S. 668 (1984), drives me as well to the conclusion that this motion must be denied. To sustain a claim of ineffective assistance, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. In making the determination whether the specified errors resulted in the required prejudice, a court should presume, absent challenge to the judgment on grounds of evidentiary insufficiency, that the judge or jury acted according to law." 466 U.S. 695.

The Strickland court taught much more that is particularly relevant to this motion. It taught that the defendant must show that counsel's representation fell below an objective standard of reasonableness, at 687-88; that judicial scrutiny of counsel's performance must be highly deferential and that a fair assessment of counsel's performance requires that every effort be made to eliminate the distorting effects of hindsight; that a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance, at 689 and, "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be

15

relied on as having produced a just result." 466 U.S. at 686.

LoCascio has shown none of these. The extensive history of this case during which every conceivable challenge to the unanimous verdict of guilt has been mounted and rejected, see 372 F. Supp.2d 304, 306, n.2 (E.D.N.Y. 2005), provides substantial assurance that the proper functioning of the adversarial process has not been undermined and that the trial can be relied on as having produced a just result.

For all of the foregoing reasons, the motion is denied.

SO ORDERED.

Dated:    Brooklyn, New York
           November 16, 2005

S/ _____
    I. Leo Glasser